18-1588, American Association of Political Consultants v. Federal Communications Commission and others. Mr. Rainey, nice to have you here, sir. Thank you, sir. May it please the Court. Good to see you. My name is William Rainey on behalf of the American Association of Political Consultants and the other appellate. My colleague, Kelly Klubeck, is with me on the briefs. This is a facial challenge to the Telephone Consumer Protection Act cell phone call ban, also known as the TCPA. Congress passed the TCPA in 1991 to protect telephone subscribers' privacy rights in connection with commercial telephone solicitations. But now the government is using the law to benefit politically favored constituencies. The law in this area used to mean one set of rules applied equally to all. Now the game has changed. The law nominally restricts everyone but singles out the few, the happy few, that band of robocallers for special treatment. Those are my words. Those are the words of FCC Chairman Ajit Pai found in the Joint Appendix at page 279 and in the FCC record from May 6, 2016. He is referring to the law we challenge today, the cell phone call ban, found at 47 U.S.C. 227B1A3, which makes it unlawful to make any call other than a call made for emergency purposes or made with the prior express consent of the call party using any automatic telephone dialing system or an artificial or pre-recorded voice to any telephone number assigned to a cellular telephone service unless such call is made solely to collect a debt owed to or guaranteed by the United States. That last language, the exemption for calls made to collect a debt owed to or guaranteed by the United States, is known in our briefs as the government debt exemption and is an exemption to the cell phone call ban. The than one designed to favor the speech of one speaker over its competitors. That's from the United States versus Playboy Entertainment. It's also well established that the law may not treat fully protected speech, like that of my political organization clients, less favorably than commercial speech, like advertising or debt collection. Okay, Mr. Rainey, so in your analysis then, are you saying that the fact that it is an exemption, in other words, a debt collector of a government-sponsored loan, is irrelevant to the analysis? It is extremely relevant to the analysis. Okay. It is relevant because that exemption makes the entire cell phone call ban content-based. As a content-based restriction, it's subject to strict scrutiny, must be narrowly tailored to further compelling government rights. But if we accept your argument that it is subject to strict scrutiny, what relevance does the government's role in the exception play? The relevance is that that exemption is unrelated to any compelling government purpose. That exemption cannot further residential privacy, which is the purported government purpose. The Supreme Court in... So you're saying the government couldn't initiate, forget the debt collector of the government-sponsored loan, are you saying then that the government could not initiate a call? The government could. The government has sovereign immunity. There's government speech. Okay, then why can't the agent of the government, or you're disputing the fact that the debt collector is an agent of the government? I am disputing that. Okay. That exemption would apply to thousands of entities that are collecting debts owed to them. The fact that it is guaranteed by the government does not make that government speech and it does not make that debt collector a government agent. So they have really no relationship, you're saying, as far as this analysis goes? Absolutely. In the government's brief, they claim that this exemption is relationship-based rather than content-based. Oh, no, no. I'm not making that point. No, I think you've made a very strong argument with regard to the content. Okay. Thank you, Your Honor. But my concern is, is the government's role as the actor, and you're saying the government isn't the actor, that it's the debt collector, and the government gains no advantage from the fact that it's a government-based loan. Yes, Your Honor. Is that what you're saying? And I would point to the example of thousands, perhaps tens of thousands of Fair Debt Collection Practices Act cases against these debt collectors, and they have ruled that they're government agents. They've ruled that those government-backed debt collectors are still subject to the Fair Debt Collection Practices Act and other consumer protection laws. Mr. Rainey, you haven't brought a case in our original jurisdiction challenging any of the FCC exemptions, but does the reference to 2B, which in itself makes distinctions between commercial speech and non-commercial speech, is that part of the argument that this is not content-neutral, as well as the government debt exception? No, Your Honor. We're solely challenging the cell phone call ban at B1A3. B1A3. Congress and this Court have recognized that commercial calls, debt collection, for example, had a worse effect on residential privacy than political or charitable calls. This circuit ruled in Cahaley v. La Rosa in 2015, citing the congressional record that, quote, complaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations. And citing that fact, this circuit struck down South Carolina's robocall statute because it targeted political calls but allowed other calls to be made. The TCPA cell phone call ban violates all these precepts on its face. As such, it is content-based, presumptively unconstitutional, and it is the government's burden to show that it can withstand strict scrutiny, that no less restrictive means could accomplish any legitimate goal the government may have had when it passed the cell phone call ban. This is a facial challenge to a federal statute. As such, this Court's review is de novo of Judge Depper's decision. The remedy we seek leaves the rest of the TCPA in place. Included is the national do-not-call list, company-specific do-not-call lists, perfused disclosures, and other less restrictive means to protect residential privacy than an outright ban. How many other challenges to this statute have there been? There have been quite a few challenges to this statute through the years. It was upheld in 1995 before the government debt exemption was passed, before many of the FCC exemptions were passed. But it has been challenged in other jurisdictions. There's currently an appeal at the Ninth Circuit in a case called Four or five. Four or five? Yes, sir. And in district court? Yes, sir. How many have gone to the courts of appeals? None on this issue. Pardon? None on this issue. The Supreme Court has considered a couple of TCPA cases, but it's not on this issue. And none of them have reached the appeal. The Ninth Circuit case, Galleon, has been briefed. I don't think it's been scheduled for oral argument. The Ninth Circuit case is on all fours? Yes, sir. But it hadn't been resolved? Correct. Okay. And did the district court out there rule the same way as Judge Dever? Yes, sir. Okay. So the two district courts have agreed, and both their opinions are on appeal? Yes, sir. At least two district courts. It might have been brought... I think it's been addressed in other cases as well that I don't know have been appealed. But the Galleon case and the Ninth Circuit and this case... Have any of the district courts? No, sir. Okay. Well, that's all right. I mean, I'm not trying to inventory the situation as it presently exists. I mean, you may be dead wrong. And although they haven't gone our way, the Fourth Circuit is very important in the Cahaley v. Rosa case, which rules that it is the exemption that must further the government compelling purpose. And there can be no relation between the government exemption and furthering privacy. So do you Before you get to the main, the restrictions, what about the government interest? You haven't raised any issue about whether, or not much of an issue, about whether the government interest asserted this case is a compelling interest or whether this restriction is in furtherance of that interest. Is that part of your position? Yes, sir. I would argue that the government can't meet its burden in that respect. I don't want to... You can go in whatever order you want, but I just wanted to raise that issue and not go straight to the less restrictive means. As the Supreme Court noted in Reed v. Town of Gilbert, a content-based restriction must be narrowly tailored to further a government of compelling purpose. Reed involved a town that had 27 exemptions to its sign ordinance. And Justice to demonstrate that the code's differentiation between temporary directional signs and other types of signs, such as political signs, furthered a compelling government purpose. And that's what I'm saying here. They can't show that the exemption furthers residential privacy. And it doesn't make sense that it could because the call is coming into a person and it disrupts their privacy. How does that call not disrupt privacy, especially considering this court's ruling in Cahaley that political and charitable calls have less of an effect on residential privacy than debt collection calls? So yes, I would argue that they can't meet the compelling government purpose because the exemption has no relation to that purpose. And that's this circuit's ruling in Cahaley v. La Rosa, the Supreme Court's ruling in Carey v. Brown, and the Supreme Court's ruling in Reed v. Town of Gilbert. On March 26, 2018, the District Court granted summary judgment for Attorney General Sessions, holding that the cell phone call ban was content-based but that it was narrowly tailored to further a compelling government purpose. We filed a timely appeal in March and May 2018. As I mentioned briefly, there are three cases that control this challenge. Carey v. Brown from 1980 involved a ban on picketing, residential picketing, but it contained an exemption for labor picketing, the sole topic of pro- or anti-labor disputes. And the Supreme Court ruled that that exemption made the entire statute content-based. The Supreme Court noted that the exclusion of labor picketing could not be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based labor or non-labor distinction had any bearing on privacy, exactly analogous to this case. The Supreme Court in Carey held the entire statute was unconstitutional based on that exemption. It did not sever the exemption as the government would request in this case. Mr. Rennie, I want to get back, get you back to the Cahalli case and your statement earlier in the argument that one of the holdings of Cahalli was that the exemption itself must further the government interest and not the statute as a whole. And I've been looking through Cahalli again, and I'm interested in what language in Cahalli you rely on for the proposition that you're asserting here that the exemption itself must further the government interest rather than looking at the statute as a whole to see whether, with the exemption included, it still furthers the interest. I can cite, I will have to do that. I'm rebuttaled because I have to complicate my guess. Okay. If you could take a look at Cahalli and tell me what language you rely on for that proposition. Yes, Your Honor. I can cite the language from Reed versus Town of Gilbert that it is the town's burden to demonstrate that the code's differentiation furthers a compelling government purpose. And the exact same language I just cited from Carrie B. Brown. Right. But I think it's really important for us to know, in terms of your argument and the government's argument, whether we're talking about whether the interest is furthered, whether it is the interest of the exemption standing alone or the interest of the whole statute including the exemption. I would cite Reed. Well, if you'd bring that to our attention on rebuttal. Yes, sir. Yes, ma'am. And I would also cite the language in Carrie B. Brown, which I just quoted, which talks about the distinction between labor and non-labor picketing having no effect on residential privacy. Why wouldn't, I know you take the position that if we were to agree with you, we shouldn't sever the government debt exemption. But why would not severing that exemption be allowed under the Supreme Court rule? As I understand the test, we can do that unless it is evident that the legislature would not have enacted those provisions which are within its power independent of that which is not. And whether, if we were to strike the part that makes it invalid, whether the statute is what it's left would be operative as a matter of law. I don't understand how, I'd like to hear your explanation of how severance wouldn't meet that test. Well, Your Honor, I would cite the long-standing First Amendment doctrine that more speech rather than less speech is the answer when it comes to this sort of challenge. What about the, I understand that issue and it is interesting that a severance would perhaps result in that effect. But under the law relating to severance that I just described, how does severing the government debt not meet that test? We're not challenging the exemption, we're challenging the statute and the ability of Congress to create future protections. But you're challenging the statute because of the exemption, aren't you? Exactly. The exemption is what causes it to be contentious. So the exemption is the problem. The ability of Congress to create future content-based exemptions. Judge Qualbaum is exactly right. If we struck the exemption, you'd win. Speech as a whole would lose because more speech would be silenced and that's not what the First Amendment is about. On top of that, Congress is... But if it was content-neutral, we'd be under a completely different test and it might very well meet that test. It probably, I don't know, I shouldn't say that, but it might very well meet the test, maybe it wouldn't. And so we're talking about content-neutral tests without that. And so how would speech lose if we have a content-neutral restriction that hypothetically meets the appropriate test for that? Justice Brandeis in 1927 in Whitney v. California said that the remedy to be applied is more speech, not enforced silence. On top of that, it would not cure the problem that Congress could create additional content-based exemptions in the future, as could the FCC. In our brief, we showed there are at least six FCC exemptions. Well, you could challenge those. If they did that, you'd challenge it. I mean, if it... Okay. Go ahead and finish your answer. I've got something more to say. My answer is it doesn't cure the problem that there's still going to be future content-based restrictions. As Chairman Pai recognized, the law is no longer being applied equally. It's being applied in favor of politically favored constituencies. Thank you, Ron. Thank you very much. And you've saved a few minutes. Thank you. Ms. Powell? Nice to have you here, Ms. Powell. Thank you, Your Honor. May it please the Court, Lindsey Powell for the government. As has been noted, the restriction on the use of these technologies has been in place for almost three decades now. This is a longstanding restriction, not on what calls can be made, but simply on how they can be made. It doesn't prevent plaintiffs from making any calls whatsoever. It just prevents the use of those technologies that Congress found particularly offensive to the privacy interests at issue. They substantially increased the volume and the nuisance value of the calls being made. And that's why Congress directly took aim at these technologies. In 2015, Congress enacted a very narrow exception to the across-the-board ban, which plaintiffs concede that the statute as it existed until 2015, that that was a content-neutral and So the invalidity, as plaintiffs allege it, happens in 2015 when this narrow exception to make calls to collect government-backed debt was enacted. And those are calls that the government could make itself through the same means. The TCPA does not apply to the government, so the government is always free to use these technologies in making calls. And the government-backed debt exception simply allows certain third parties who also have a relationship to this government-backed debt to call debtors who have this relationship to the government to collect those funds that are owed to the public. Was that because they wanted to collect these college loans and students weren't paying back? It would apply to a number of different types of debt. So anything that's insured or backed by the federal government. So as it presently stands, it's only been in existence for three years? Yes, that's right, Your Honor. But if in the connection with creating a government debt, there was a transaction where the debtor would agree to being contacted either by the government or by agencies collecting for the government, you could accomplish those goals without the exception, couldn't you? Yes, Your Honor, and that will be a large number of cases. So the FCC has construed consent to apply where a debtor taking out a loan provides their cell phone number. And I'm sorry to interrupt you, I apologize, but if the express consent provision as interpreted by the FCC gives the government the ability to protect this interest, why do you need a separate exception? It seems like it's duplicative of a content-neutral provision that was already in the statute. It is largely duplicative, but not entirely. So if someone changes their phone number, the consent wouldn't carry to the new phone number. And of course, with respect to the government being able to make these calls itself, as has been discussed, not all these third parties are agents, so all the calls wouldn't come in under that piece of it, under this sort of government sovereign immunity. So it is a narrow slice, and this is highly relevant when it comes to Taylor, and this is not opening any sort of floodgates. Well, you say that it's narrow. How many calls are we talking about? That we don't have a record. So you have no knowledge of exactly, because you say it's narrow, but it seems to me if you're putting into the basket all mortgage loans, you're putting into the basket all student debt, and numerous other types of FEMA relief, other, I mean, I can't even begin to list all of them, it might not be so narrow. So just asserting that it's narrow I don't think really helps us, unless we have some understanding of, you know, proportionally what we're talking about. Right, and I do think looking at the practical effect of how the statute worked before the enactment of this exemption, and what is now additionally allowed after is relevant, because it's really the delta there. Again, everybody here concedes that the statute was constitutionally valid as enacted in 1991. That's not in dispute. And as enacted at that point, the government could already make calls using these technologies, and anyone could make them as long as there's consent. And consent has been construed pretty broadly. If you provide your cell phone number, there's consent with respect to calls to that number, within the relationship for which that number was provided. So in talking about the breadth of this exception, you're looking at how many additional calls, how many calls beyond those that were already allowed, does this let in? And common sense tells us it can't be that many, given that many of these were already allowed under the existing and consistently valid regime. Does common sense jump out of the record here? The Supreme Court has said that common sense is part of the evidence that can be provided by the government in carrying this burden here. So it is our burden. I don't have a lot of common sense about how many calls there were. I have no idea. We don't have a numerical burden. We don't have to show what the number is. But the common sense piece of it is that if you know that the government could already do much of this and that consent already did much of this, that the delta, the difference that this allows is not a great one. So that is part of the tailoring analysis. But this isn't everything. I'm sorry. Go ahead and finish your answer. I apologize. No, no. I was going to turn to something new. Does the government concede that this is a content-based statute? No, Your Honor. We don't. That is what I was going to turn to. Is the basis of your argument the relationship? Yes, Your Honor. So it's principally based on the relationship. And you see support for this in the Eighth Circuit's decision in Van Bergen, the Seventh Circuit in Patriotic Veterans, where the courts have acknowledged that a relationship is not content. And so if it's based principally on the relationship, even if you might also have to look to the content of the communication to ascertain whether it's germane to the relevant relationship, that's not enough to kick things over. And the relationship is with the government? The relationship is with the government. So it's not with the caller necessarily, but nothing says it needs to be. What needs to be true is that it's not based exclusively on what is being said. And here you could take two identical calls. The caller could say exactly the same thing in two different instances. Well, then is the caller the agent of the government? Not necessarily. Well, is it? Is the caller of these mortgage-based loans, student loans, are they then the agent of the government in your analysis? Not necessarily. Well, what are they with the government? You're talking about a relationship, and I'm trying to get some handle on what is this legal relationship? If it's not agency, what is it? The relationship that we are pressing here is the relationship between the government and the debtor, not the government and the caller. So it's the debtor who, in taking out this loan, has forged a relationship with the government that is backing the loan in some way. That the debtor owes money to the government? Yes. Or to some government agency? Yes. And somebody is making a call trying to collect it? Yes. Why would they be making a call trying to collect it unless they didn't have some relationship with the government? They will have some relationship. They got to have an interest in collecting the debt. Are they getting a commission? They absolutely are, and they do have a relationship with the government. They do have a relationship with the government. They do have a relationship with the government. Yes, but that's not the one on which we're hanging our hats here. You're not hanging your hat. What kind of relationship do they have with the government? It will vary case to case. In some cases, it will be an agency relationship. In some cases, it may be the government itself calling. In some cases, it may just be that the government is in the background. Could it be a bank? Providing insurance. Yes, it may be a bank calling. It may be a bank calling to try to collect for the government. Yes. So the relationship between the government and the caller will vary. Sometimes it will be agency, sometimes not. But what we say is important. So who sponsored all this getting this exemption put in here? The banks? I believe it was proposed in the president's budget for 2016. So it was submitted in 20... I guess it would have been for 2015. But it was part of the president's budget proposal in order to collect millions of dollars of outstanding debt. So it was found that by including this exemption... A lot of people owe a lot of money to the government. We'll acknowledge that. But who was trying to get the exemption put in? I... The banking associations? I don't believe... Do you know? I mean, it's probably a matter of public record. It ought to be in this record somewhere, I imagine. The place that I've seen it... Legislative record, right? Is as a proposal in the budget submitted by the president to Congress. I don't know if there's further background beyond that. But I believe this was a government-driven effort to collect monies that are properly owed to the public. These are taxpayer funds. Let's assume we think it's a content-based speech or a content-based statute and restriction on speech. What's the compelling interest that the government asserts here? It says it's... It says it's the protection of privacy in individual residences. Is that correct? Yes, Your Honor. And to the question... But let me follow up on that. So the cases that you cite for that are cases where people have picketed in front of someone's home, correct? Yes, Your Honor. And so here we have an invasion of privacy. Probably... I'm not sure that's debatable. But it's a far different invasion than picketing on the street. It's calls that are a bother, an annoyance, but can be solved by turning off your phone or putting it on silence. I mean, isn't the reliance on carry in those cases fairly a stretch given what we're talking about here? Plaintiffs don't actually dispute that there's a compelling privacy interest here, but with respect to carry and Frisbee, the privacy interest is even more profound here. You're talking about calls that actually intrude into the physical space of the home or wherever it is that you bring your phone with you, and it's not a simple matter to turn off your phone. That's a shifting test. If the issue is just general privacy, that's something for us to consider. But from your papers, you're saying it's privacy of one's residence. And I suspect the effect of this statute has at least as much of an effect outside the residence as it does in the residence. So is it just being bothered by cell phones or is it being bothered by cell phones in your home? I believe we say personal and residential privacy. So it's not just in the home. Certainly the home is the one that's been discussed more in the case law and the Supreme Court has called the residential privacy an interest of the highest order. So that's because the cases were prior to the cell phone being part of the culture? Yes. But now everybody's got a phone in their pocket. Right. And if you look at patriotic veterans, it was acknowledged in another auto dialer restriction case in the Seventh Circuit. Judge Easterbrook there acknowledged that having the invasion be in your pocket, in your home, wherever it goes with you. You're talking about a number of different privacy interests. But you're saying that's a compelling... Has a circuit court of the Supreme Court held that a call on a cell phone is a compelling state interest? I'm not sure whether it's come up in the context of a strict scrutiny analysis where they would have had to differentiate between it just being substantial and compelling. But I do think even just looking at the Supreme Court statements about the residential privacy being of the highest order, we have residential privacy here and we have the personal privacy, other dimensions of it on top of that. And again, plaintiffs don't contest that we have a compelling interest here. That's not in dispute. We have... You know, this is a First Amendment, so we can look at whatever part of the test, the strict scrutiny test, applies if that's the test that's a political. It may be a whole different... It might have been a whole different inquiry if you didn't make it... If it's not content-based, I know you challenged that. If we were to say it's content-based, it makes us look not only at whether this furthers a compelling state interest, but also whether it's as restrictive as possible. Yes, Your Honor. Ms. Powell, let me ask you a question about the same question I asked Mr. Rainey. Mr. Rainey's making the assertion that the exemption itself has to further the compelling interest. Do you agree with that or do you disagree? No, Your Honor, we disagree. And we read reading Cahaley contrary to how Plaintiff's Counsel does. The way the analysis has proceeded, as you look particularly where it's here, we have a challenge to a statute as a whole. They're challenging the auto-dialer restriction. And so the analysis proceeds with respect to that restriction. You ask, does the restriction further a compelling interest? Is it narrowly tailored to that interest? And then, of course, the exception factors into the analysis. But it does so at the next step, where you say, does the exception call into doubt the analysis that preceded? And that's usually an under-inclusiveness inquiry. And so in Reid and Cahaley, what the courts did is they said, do the many and broad exceptions in those cases call into doubt the sincerity of the government's interests or the ability of this scheme to advance those interests? So it wasn't the exceptions themselves you're saying, it was the statute including the exemptions. Do they call into question the validity of the compelling interest? Yes, Your Honor. That is how we read it. And here, for many of the reasons we've already discussed, the narrow government debt exception does not call into doubt the sincerity of the government's interests and privacy or the ability of the statute overall to achieve them. The auto dialer ban applies across the board with this narrow exception. And it prevents a large volume of calls that Congress found to be a great nuisance to the public. It prevents these calls in almost every instance with this narrow exception. And so, unlike Reed and Cahaley where the court found that the exceptions would allow the unlimited proliferation of precisely the types of calls that the statute was meant to prevent, we don't have that here. We have a narrow swath. And that is entirely consistent with the First Amendment. The courts have been clear that Congress doesn't have to solve every single aspect of the problem for it to be consistent even under strict scrutiny. That's Williams-Uly. The courts have said it in other contexts, including the applicant. Did you anticipate they were going to get hit with this litigation when they put this exception in there? Did the government anticipate it? Did the government anticipate this litigation? To my knowledge, no, Your Honor. You don't think they did? There's nothing in the record to indicate they did. They got broadsided with it? To my knowledge. Also, it may be significant that the timing of the Reed decision may have something to do with the ensuing lawsuits. But we don't think Reed actually changes the analysis in ways that are relevant to this case. If the court were to disagree with the foregoing, we do have a very strong argument on severability here. We don't think you need to get there because we think... It's your position that it's severable? It's clearly severable, Your Honor, yes. If we think that there's a problem here, we can order that aspect up to stricken? Yes, Your Honor. So the touchstone of that analysis is legislative intent. And we know that Congress enacted the statute without this allegedly offending exception. And it was in place and functioned very well for almost 23 years before the exception was added. Well, he succeeded. If the government was making the calls, that'd be all right, too. Right, Your Honor, which goes one more thing pointing to the validity of the earlier statute. But in terms of severability, the main thing we need to look at is whether Congress would have intended the auto dialogue restriction as a whole to stand without the exception. And it clearly would have. And the fact that it would, that striking just the exception would serve to restrict more speech doesn't change that analysis. The inquiry is still legislative intent. And you've seen courts performing the severability analysis this way even where it has that result. The Eighth Circuit recently did that in Gresham in very analogous circumstances. And so that would be the appropriate result here. Would that be consistent with the exercise of judicial restraint? Rather than striking the statute as a whole? Yeah. Yes, Your Honor. We haven't relied on that doctrine in particular. But certainly it would be an extraordinary thing to strike a concededly valid statute rather than excising a later enacted and narrowly offending provision which would restore the validity of the underlying statute. The statute became contaminated in 2015? Allegedly. Right. I mean, assuming we agree with them. It became contaminated and we can cure it. Yes. That is precisely how that analysis works and it certainly applies here. Plaintiffs do assert that the regulatory exemptions... Or the government could cure it without us doing anything if it would make all the calls itself. Quit trying to get somebody else to collect your bills. Yes. Yes. But he said up here if the government makes the calls they're protected by sovereign immunity. Yes. So they can make all the calls they want to collect their bill. We agree with all of that. Yes, Your Honor. So you could fix it without us doing anything. But it's a perfectly valid statute. We could take it under advisement and you could go back and get them to get a new program to make all the calls. That is true, Your Honor. Or have consent to let you make the calls. Yes, Your Honor. Which again, we'll cover many of them already. I don't know if the panel has any questions about the interplay of the regulatory exemptions here stated in our brief. Our position is that they don't fare on this analysis in any way. They can't serve after the fact to call into doubt the validity of a constitutionally enacted statute. So we might be happy to answer any questions on that if there are any. So your position is and I realize those exemptions aren't specifically under a tie in this case. But your position is we can't consider the fact that under B2 there have been additional content-based exemptions in whether this statute is content-based or not? Yes, the exemptions can't serve to make the statute content-based. But isn't the mechanism for exemptions content-based as well that it distinguishes between commercial and non-commercial speech That's on the face of the statute, right? We disagree that that makes the statute content-based and plaintiffs as they said aren't pressing it. The Knights are going to address this question in Moser and it said that because that authority is permissive it doesn't require the SEC to enact any content-based distinctions. It doesn't require a distinction between commercial and non-commercial speech. It doesn't serve to make the statute itself content-based. Okay, so the issue is not whether I mean, clearly if you distinguish between commercial and non-commercial in a hypothetical sense that's content-based but you're saying because it's permissive it's not in effect a content-based restriction? That is what the Ninth Circuit has said and again plaintiffs aren't pressing that. The commercial non-commercial distinction does remind me of one other point I wanted to make which is just to point out the calls to collect government-backed debt are not fundamentally commercial. These are calls to restore money to the public fisc. That's the bottom line of these calls. That's the purpose for which the exception was enacted. And so regarding this as a commercial transaction I think misses the purpose of the exception and the appropriate way of thinking about what's going on here. So there is no distinction with this exception between commercial and non-commercial speech in the way that plaintiffs have suggested. If there are no further questions we ask that you affirm. Thank you. Thank you Ms. Powell. Mr. Rainey. Yes sir. Thank you. Judge Keenan the language that Judge Diaz used in Kahaley is analogous to that in Kerry and Reed with regard to the exemptions but it couches the issue in terms of over-inclusiveness and under-inclusiveness so on page Of the statute. Correct. Not of we're not talking about an exemption but the judge noted that the exemptions cause it both to be over-inclusive because unwanted commercial calls are a far bigger problem than unsolicited political or charitable calls and under-inclusive because it permits unlimited proliferation of other types of calls. So I think that that focus on the exemptions creating over-inclusiveness and under-inclusiveness is kind of similar to that found in Kerry and Reed which evaluates the effect of the exemptions on the purported government purpose. Judge Kettlebaum you raised the B2 exemptions and I misunderstood your question I apologize I understand now and we certainly believe that the FCC's exemptions are content-based for example the exemption for a person delivering a package to the recipient of the package is not based on any relationship between the shipper and the recipient any relationship would be between the shipper and the sender and I'm not saying that's not a good idea I'm not saying that the FCC didn't act with good intent but I think they acted in a way to benefit a constituency maybe they're just trying to help but when they do that they're putting the scales the finger on the scales and the first amendment forbids that as I cited the playboy case benefiting one entity over its competitors is abhorrent to the first amendment judge king you asked are these callers banks there's federally guaranteed student loans and non federally guaranteed student loans and one has a competitive advantage over the other in that the guarantee can call under this exemption can call using the benefit of collecting the money doesn't get collected some portion gets guaranteed but I don't think it's as good as collecting the money directly why wouldn't they just let it go into the debt I think that the narrowness issue is important to because the first amendment doesn't count on fingers and toes and say ten is fine but the second amendment  ten  fine but the   on fingers and toes is fine but the first amendment doesn't count on fingers and toes and ten is fine but the            the first amendment doesn't count on fingers and toes and ten is fine but the second amendment doesn't count on            count on fingers and toes and ten is fine but the fourth amendment doesn't count on fingers and toes and ten is
judges: Robert B. King, Barbara Milano Keenan, A. Marvin Quattlebaum Jr.